UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| MICHAEL THURSTON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 2:13-CV-00013-GZS |
| | ) | |
| CUMBERLAND COUNTY, et als., | ) | |
| | ) | |
| Defendants. | ) | |

## RECOMMENDED DECISION

Michael Thurston and Paul Sans complain against Cumberland County and certain officers associated with the operation of the Cumberland County Jail that they were unlawfully made to clean the blood of a fellow inmate from the floor of the Jail without adequate protective supplies and in violation of the Jail's biohazard policy. They allege a violation of their Eighth Amendment and Fourteenth Amendment rights and a breach of due care in the operation of the prison facility. The defendants have filed a motion for summary judgment against both claims, which motion the Court referred for report and recommended decision. Based on the summary judgment record, I recommend that the Court grant, in part, the motion, dismiss the section 1983 claim with prejudice, and dismiss the state law claim without prejudice.

### FACTS

The non-moving party is entitled to have the summary judgment facts considered in the light most favorable to his cause. Wilson v. Moulison N. Corp., 639 F.3d 1, 6 (1st Cir. 2011). By local rule, summary judgment facts are introduced by means of "a separate, short, and concise statement of material facts," which statement must be supported by record citations. D. Me. Loc. R. 56(b), (c), (d). Here, the court's review of the record is guided by the Defendants'

Statement (ECF No. 31-1 (unredacted)), the Plaintiffs' Opposing Statement and Additional Statement (ECF No. 38 (unredacted)), and the Defendants' Reply Statement (ECF No. 45).

Michael Thurston was incarcerated in the Cumberland County Jail in August 2011, pursuant to a sentence of imprisonment. He was released on October 26, 2011. (Statement ¶¶ 1-3.) Paul Sans was incarcerated at the Cumberland County Jail in August 2011, also serving a sentence. Sans was released on September 26, 2011. (Id. ¶¶ 4-6.) Sans was re-incarcerated in February 2012 as a pretrial detainee and pled guilty to charges in October 2012. (Id. ¶¶ 7-8.) Sans has remained incarcerated from February 15, 2012, until the present. (Id. ¶ 9.)

On August 8, 2011, Sans, Thurston, and a third inmate of the Cumberland County Jail were playing basketball in the recreation yard when the third inmate cut his hand on razor wire. (Id. ¶¶ 12-13.) The cut bled profusely. (Opposing Statement ¶ 14.) The three went to the officer station and spoke with Officer Robert Patton, the only officer present at the station. (Statement ¶¶ 15-16.) They apprised Patton of the situation and Patton called down to medical. (Id. ¶¶ 18-19.) Medical advised Patton to make sure everything was cleaned up and put into bio-hazard bags. Thurston overheard this instruction. (Opposing Statement ¶ 19.)

Thurston and Sans obtained a bag for the inmate's hand, which stopped the blood from dripping onto the floor. However, by that time there was a trail of drops leading to the station and some blood had pooled on the floor near the station. (Id. ¶¶ 20-21.) Upon the bleeding inmate's departure for medical, Officer Patton instructed Thurston and Sans to clean up the blood. (Statement ¶¶ 22-23.) Based on Thurston's deposition testimony, Patton handed them paper towels to use. (Opposing Statement ¶¶ 24, 32.) Based on Sans's deposition testimony,

Patton also told them to get what they needed from the utility closet.[1]  (Statement ¶ 24.)  Sans and Thurston both went to the closet.  Thurston got window cleaner, the mop, and a bucket.  (Id. ¶ 25.)  Sans took two gloves and put them on, though they were too small and ripped near the fingers while he was wiping up blood with paper towels.  (Id. ¶¶ 27-28, 30.)  Thurston did not put gloves on.  (Id. ¶ 29.)

Sans did not tell Officer Patton that the gloves were too small or that they ripped.  (Id. ¶ 31.)  Thurston did not ask for gloves or say anything about gloves to Patton.  (Id. ¶ 32.)  Both men used paper towels to clean up some of the blood.  (Id. ¶ 33.)  Thurston, who was not wearing gloves, used four to five paper towels in each hand when he was cleaning the blood to provide some protection between his hands and the paper towels on the bottom that were soaking up the blood.  (Id. ¶ 34.)  Thurston did not see any blood on his hands, but does not know whether he got blood on his hands.  (Opposing Statement ¶ 35.)  After they wiped the blood up, they sprayed and mopped the area.  (Statement ¶ 36.)  Thurston washed his hands right after cleaning the blood.  (Id. ¶ 37.)

The inmate who bled has hepatitis C.  (Id. ¶ 38.)  Thurston and Sans learned this from jail personnel after they cleaned the blood.  (Id.;  Additional Statement ¶ 2.)

---

[1]         The defendants request that the plaintiff's denial of this statement be stricken.  The defendants are correct that Sans's deposition testimony supports the defendants' statement and that the plaintiffs' citation of Thurston's deposition testimony does not deny or refute Sans's version of events.  However, the fact that the plaintiffs' denial is not supported by their record citation is not a good ground for a request to "strike" the denial.  The defendants' assertion of a fact with record citation and the plaintiffs' denial with record citation raises an issue for the court to evaluate by referring to the cited evidence.  The issue is whether there is a genuine dispute of fact such that the statement asserted by the defendants is controverted by other evidence.  In this instance, Thurston's deposition testimony does not controvert Sans's deposition testimony.

The defendants have made several more requests to strike that are really just assertions about whether the plaintiffs' record citations are supportive of the plaintiffs' qualifications and denials.  Requests to strike are not called for in such cases.  The qualifications and denials already require the Court to consider what factual finding the cited evidence would support.  The defendants do not need to flag these disputes with a request to strike.

Sans has hepatitis C. (Statement ¶ 41.) However, Sans had hepatitis C before this exposure and his condition is asymptomatic. (Id. ¶¶ 42-43.) Since the incident, Sans has received testing for hepatitis C four times, and he has never been told that he has any different type of hepatitis C than what he already had. (Id. ¶ 44.) Sans does not believe he was injured or harmed physically from this incident. (Id. ¶ 45.) Sans did not file a grievance concerning this incident. (Id. ¶ 46.)

Thurston had two blood tests done to test for hepatitis C while he was incarcerated at the jail and both came up negative. (Id. ¶ 39.) Thurston had a third blood test done to test for hepatitis C after being released and that test also was negative. (Id. ¶ 40.) Thurston drafted a letter on September 15, 2011, addressed to Captain Butts, asking that the captain preserve surveillance video of the incident and Thurston sent his letter on September 19, 2011. (Id. ¶ 47.) Thurston asked that the notary public in the jail notarize the letter, but she refused. (Additional Statement ¶ 3.) This letter was the first time Thurston asked for the video of the incident to be preserved. (Statement ¶ 48.) It is undisputed that the video footage was recorded over before Thurston's request reached its intended recipient and it is also undisputed that video media is often reused in the ordinary course after 30 days. (Id. ¶¶ 49-50.) Captain Butts met with Thurston to discuss his letter, the incident with the blood, and the officer refusing to notarize the letter. (Additional Statement ¶ 6.) Thurston filed a grievance on October 3, 2011, to complain about the refusal to notarize his letter and to preserve the video footage. (Id. ¶ 7.) The grievance and Thurston's appeal were both denied. (Id. ¶ 8.) One officer at the jail told Thurston that video surveillance tapes are normally kept for 60 days. (Id. ¶ 9.)

**Policy and Procedure**

Kevin Joyce has been the Sheriff of Cumberland County since January 2011. (Statement ¶ 51.) As Sheriff of Cumberland County, Joyce has final decision making authority with respect to all policy and operational matters at the Cumberland County Jail. (Id. ¶ 52.) The Cumberland County Sheriff's Office maintains a Policy and Procedure Manual that contains the official policies and procedures of the Cumberland County Jail. The Manual is available for staff to review on the computer. Staff are required to review and be knowledgeable and conversant with the policies in the manual.[2] (Id. ¶ 53.)

*Biohazard policy*

Cumberland County Jail Policy and Procedure F-309 is the official policy and procedure of the Cumberland County Jail regarding biohazards and was in effect on the date of the incident that gave rise to this lawsuit. (Id. ¶ 54.) Policy F-309 references the Cumberland County Sheriff's Office Exposure Control Plan, which has been adopted by the Cumberland County Sheriff's Office and was in effect on the date of the incident. (Id. ¶ 55.) Both Policy F-309 and the Exposure Control Plan state that inmates are not permitted to clean biohazards. (Id. ¶ 56.)

Policy F-309 (ECF No. 28-5) is dated October 2007 and entitled "Biohazard." It is a one-page document that reads, in relevant part:

> The Corrections Division clean and dispose of biohazard material in a safe
> manner to provide proper sanitation for staff, inmates, and the facility.

---

[2] The plaintiffs offer a qualification that they requested the Manual but did not receive it in discovery and have not been able to review it. (Opposing Statement ¶ 53.) The defendants, citing the plaintiffs' requests for production of documents (RFPD) (ECF No. 45-1), respond that the plaintiffs only requested "copies of any written policies or procedures regarding steps or measures your staff should follow in order to clean up bio-hazardous materials such as blood." (Reply Statement ¶ 53.) The plaintiffs have not challenged this representation, which is supported by paragraph 6 of the RFPD. I have overruled the plaintiffs' "qualification," which is really in the nature of a request to strike a statement based on an alleged discovery violation. The defendants' reference to the Manual does not undermine the plaintiffs' case and the plaintiffs do not suggest that the defendants failed to produce either the Biohazard policy or the Exposure Control Plan.

**DEFINITION**:

**Biohazard**:  Requires the observance of universal precautions which mandates that all human blood and body fluids are to be treated as if known to be infectious HIV, HBV, bloodborne pathogens, and airborne pathogens.

At no time will inmates be used to clean any biohazard material.

(Additional Statement ¶¶ 12-13;  Reply Statement ¶¶12-13.)

The Exposure Control Plan (ECF No. 28-6), last revised January 2011, describes the dangers of blood-borne and air-borne pathogens and the protocols that must be followed when handling such materials.  The Exposure Control Plan is designed to protect jail employees.  It includes certain "determinations" concerning the potential exposure faced by employees in different job classifications.  Among other determinations, the Plan indicates that jail maintenance staff has potential exposure from "handling of contaminated waste."  (Additional Statement ¶ 11;  see also PageID## 365, 381, 383.)  The Plan also prescribes "universal precautions," including a prohibition against having inmates clean biohazards.  (PageID# 389.) The term "biohazard" is not defined in the Exposure Control Plan.  (Additional Statement ¶ 11.)

Officer Patton received training on bloodborne and airborne pathogens and on the Exposure Control Plan in October 2007, February 2008, and January 2011.  (Statement ¶ 57.)

Following the incident underlying this action, Major Francine Breton issued a memorandum dated October 7, 2011.  (Additional Statement ¶¶ 14-15.)  In her memo (ECF No. 28-11), Major Breton states that she wrote the memo to "clarify questions regarding what is biohazard waste and what is not."  (Id.)  Citing the "Bureau of Waste Remediation and Management," Major Breton states that "urine and feces" and "sludge, septage, and waste water" are not considered biohazards.  Major Breton further states that OSHA does not consider exposure to feces, urine, and certain other body fluids not including blood, to be

regulated by OSHA's bloodborne pathogens standards. The memo concludes by directing

CCJ officials not to use biohazard containers when such fluids are present. (Id.)[3]

*Grievance procedure*

The Cumberland County Jail grievance policy provides that a grievance may be initiated

by an inmate for an alleged violation of civil, constitutional, or statutory rights; an alleged

criminal or prohibited act by a staff member; or to resolve a condition existing within the facility

that creates unsafe or unsanitary living conditions. (Statement ¶ 58.) The plaintiffs assert that

this policy should be disregarded because it was not produced in discovery and is not among the

stipulated exhibits. This "denial" is repeated for statement paragraphs 59, 60, and 61, which

describe the grievance process. The defendants say that the plaintiffs requested documents

related to complaints and appeals, but only concerning complaints and appeals actually made.

They state that the plaintiffs did not request the entire policy and procedure manual or the

grievance provisions in particular. They also note that the plaintiffs did not depose anyone who

might have testified about existing grievance policies. (Reply Statement ¶ 58.) They fail to

acknowledge that they have initial disclosure obligations that could call for the production of a

grievance policy that supports their affirmative defense. I defer ruling on this evidentiary dispute

because the failure to exhaust defense is superfluous in the context of my recommendation that

summary judgment enter on the merits of the section 1983 claim.

**Evidence of practice related to bio-hazardous waste policy**

Jesse Chatfield has been incarcerated at the Cumberland County Jail where he has seen

biohazard waste cleaned up on five to six occasions and each time the corrections officers

---

[3]     It is not readily apparent why the plaintiffs consider Major Breton's memorandum to be material to their case. This case does not involve the handling of bodily waste. These statements appear to spill over from another case being handled by plaintiffs' counsel in which similar claims are being pressed based on orders directing detainees to clean up sewage following a toilet overflow. Westerman v. Cumberland Cnty., 2:13-cv-00014-GZS.

cleaned the waste up. (Statement ¶ 62.) The inmate who cut his hand on the razor wire has seen fights at the Cumberland County Jail where blood was left behind and the entire pod was locked down while the corrections officers cleaned the blood up. (Id. ¶ 63.) Thurston was incarcerated in the Cumberland County Jail for several months in 1998 and in 2011, and in all that time he was never asked to clean a biohazard other than this one time and he never saw another inmate cleaning a biohazard. (Id. ¶ 64.) Sans has been incarcerated in the Cumberland County Jail numerous times and the only other time he had to clean biohazards or has seen other inmates clean biohazards was in 2008 when he and other inmates were told to clean up a homeless camp behind the jail where there were buckets of urine and feces. (Id. ¶ 65.)

**Facts related to the Maine Tort Claims**

The Maine County Commissioners Association Self-Funded Risk Management Pool (Risk Pool) is a public self-funded pool established pursuant to 30-A M.R.S.A. ch. 117. (Id. ¶ 66.) Cumberland County is a Named Member of the Risk Pool and is provided with insurance-type coverage pursuant to a document entitled Maine County Commissioners Association Self-Funded Risk Management Pool Coverage Document. (Id. ¶ 67.) The Coverage Document specifically excludes any coverage for any cause of action seeking tort damages for which the County is immune pursuant to the Tort Claims Act, and limits coverage to those areas for which governmental immunity is expressly waived by the Tort Claims Act. (Id. ¶ 68.) Other than the insurance-type coverage provided to Cumberland County under the Risk Pool's Coverage Document, Cumberland County has not procured insurance against liability for any claim against the County or its employees for which immunity is not otherwise waived under the Maine Tort Claims Act. (Id. ¶ 69.)

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court reviews the factual record in the light most favorable to the non-moving party, here the plaintiffs, resolving evidentiary conflicts and drawing reasonable inferences in their favor.  Hannon v. Beard, 645 F.3d 45, 47-48 (1st Cir. 2011).  If the court's review of the record reveals evidence sufficient to support a judgment in favor of the non-moving party on one or more of their claims, then there is a trial-worthy controversy and summary judgment must be denied to the extent there are supported claims.  Unsupported claims are properly dismissed.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses.").

DISCUSSION

The complaint recites two counts.  The first count is advanced by both plaintiffs under 42 U.S.C. § 1983 and claims a violation of the plaintiffs' rights under the Eighth Amendment and the Fourteenth Amendment.  The second count is advanced by Thurston alone, who claims that the defendants are liable to him for common law negligence.  The defendants challenge these counts on numerous grounds.

**A.      The Constitutional Claim**

Title 42 of the United States Code, section 1983, confers upon every United States citizen a right to redress against any person who, acting under color of state law, causes a deprivation of his or her "rights, privileges, or immunities secured by the Constitution and laws" of the United States.  To maintain a claim under section 1983, a plaintiff must establish two things:  (1) that the

conduct complained of has been committed under color of state law and (2) that this conduct worked a denial of rights secured by the Constitution or laws of the United States." Barreto-Rivera v. Medina-Vargas, 168 F.3d 42, 45 (1st Cir. 1999) (citing Martinez v. Colon, 54 F.3d 980, 984 (1st Cir. 1995)).  Other than providing a cause of action, section 1983 of the Civil Rights Act does not confer any substantive rights;  the rights that are vindicated in the action have to arise under another federal statute or constitutional provision.  Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979).  "As in any action under § 1983, the first step is to identify the exact contours of the underlying right said to have been violated."  County of Sacramento v. Lewis, 523 U.S. 833, 842 n.5 (1998).

In this case, the plaintiffs allege a violation of their Eighth Amendment right to be spared from the infliction of cruel and unusual punishments and their Fourteenth Amendment right to analogous substantive protection under the Due Process Clause.  They claim a deprivation of this right based on being made to clean up another inmate's blood.  They assert their claim not only against Officer Patton, who was present and issued the order, but also against the jail administrator, the sheriff, and the people of Cumberland County, none of whom were present when the incident transpired.

Officer Patton contends that he is entitled to summary judgment because the evidence does not support an inference that he knowingly violated the plaintiffs' clearly established constitutional rights.  The other defendants assert that they are entitled to summary judgment for this same reason, but also because the evidence cannot support the imposition of either supervisory or municipal liability.   Finally, with respect to Plaintiff Sans, the defendants assert that Sans cannot proceed with a section 1983 claim because Sans failed to exhaust administrative

remedies and because Sans concedes the absence of any physical injury. (Motion for Summary Judgment, ECF No. 32.)  I begin with the municipal and supervisory claims.

1.    **Supervisory and municipal liability**

The County, Sheriff Joyce, and Administrator Breton protest that the record does not contain the sort of evidence that would support the imposition of either municipal or supervisory liability.  (Motion at 11-14.)  The plaintiffs concede the point by not challenging these arguments in their responsive memorandum.  Concerning their constitutional claim, the plaintiffs argue only that summary judgment is not warranted on the claim against Officer Patton. (Response at 9-12, ECF No. 37.)

Under section 1983, municipalities cannot be held liable for constitutional violations perpetrated by municipal employees simply because they are the employers.  Welch v. Ciampa, 542 F.3d 927, 941 (1st Cir. 2008) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978)).  Section 1983 claims against a municipal defendant will only be successful under Monell if the entity was responsible for a policy, custom, or practice that caused the violation in question.  Id.  Here, the evidence of record would not support a finding that any constitutional violation befell the plaintiffs as a result of a municipal policy, custom, or practice.

Similarly, supervisors cannot be held liable for violations perpetrated by their subordinates unless there is evidence of a link between the violation and some form of "supervisory encouragement, condonation or acquiescence or gross negligence amounting to deliberate indifference." Pineda v. Toomey, 533 F.3d 50, 54 (1st Cir. 2008).  The evidence of record does not support a finding of this kind of supervisory involvement.

The court should grant Cumberland County, Sheriff Joyce, and Major Breton summary judgment against count I.

## 2.    Officer Patton

The parties' memoranda reflect agreement with the proposition that the plaintiffs' claims must be measured by the Eighth Amendment deliberate indifference standard.  Under both the Eighth Amendment and the Fourteenth Amendment, sentenced prisoners are entitled to protection against acts reflecting deliberate indifference toward prison conditions imposing a substantial risk of serious harm.  Burrell v. Hampshire Cnty., 307 F.3d 1, 7 (1st Cir. 2002) (involving inmate violence);  Giroux v. Somerset Cnty., 178 F.3d 28, 32 (1st Cir. 1999) (same). A deliberate indifference claim has two elements.  First, the prisoner must demonstrate that he was subjected to a condition that posed a substantial risk of serious harm.  Farmer v. Brennan, 511 U.S. 825, 834 (1994).  Second, the prisoner must demonstrate that the officer who imposed the risk acted with a state of mind sufficiently culpable to amount to deliberate indifference.  Id.

The defendants contend that neither element is established on this record.  (Motion at 8.) They say, "There is no evidence that Patton was aware that having inmates clean blood under these circumstances created a substantial risk of harm."  (Id.)  The plaintiffs respond that it is a jury question whether the conditions violated the Eighth Amendment and they note that the blood they handled "happened to be infected with a potentially harmful virus."  (Response at 10.) Concerning Patton's subjective state of mind, they say that Patton "must have been aware of the serious nature of exposure to human blood," given his training, and that his failure to follow the established policy reflected a culpable level of disregard, especially in light of the fact that he was advised by medical to make sure the blood was cleaned up and that everything was put into biohazard bags.  (Id. at 11.)

### a.    Serious risk

The record evidence is sufficient to establish a condition that exposed the plaintiffs to a substantial risk of serious harm.  This can be found based on the fact that the blood was, in fact, infected with a contagious disease, although the existence of a pathogen in the blood may or may not be a constitutional requirement.  The jail policies also adequately reflect the seriousness of this kind of exposure.  Prisoners are not to clean up blood because of the serious hazard presented by such activity.  Officer Patton, based on undisputed evidence, in fact exposed the plaintiffs to a substantial risk of serious harm.

### b.    Deliberate indifference

"[T]he Supreme Court has specified that deliberate indifference requires that 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and he must also draw the inference*.'"  Leavitt v. Corr. Med. Servs., 645 F.3d 484, 497 (1st Cir. 2011) (quoting Farmer, 511 U.S. at 837) (emphasis added).  Deliberate indifference can be established, for example, with evidence that the defendant imposed the risk with punitive intent or with evidence that the defendant had "actual knowledge of impending harm, easily preventable."  Id. (quoting Watson v. Caton, 984 F.2d 537, 540 (1993)).  Deliberate indifference proscribes "a narrow band of conduct," such that a mere failure to do what a reasonable person would do under the circumstances (common law negligence) will not satisfy the standard.  Feeney v. Corr. Med. Servs., 464 F.3d 158, 162 (1st Cir. 2006).  Deliberate indifference is on the order of something "repugnant to the conscience of mankind," Estelle v. Gamble, 429 U.S. 97, 105 (1976), taking into consideration "contemporary standards of decency."  Rhodes v. Chapman, 452 U.S. 337, 347 (1981).  "[C]onditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional."  Id.

The record in this case is not sufficient to support a finding that Officer Patton acted with deliberate indifference and thereby subjected the plaintiffs to cruel and unusual punishment. At most, the record reflects that Patton violated a jail policy through carelessness and oversight. Violation of the policy could well support an inference that Patton failed to observe a standard of ordinary care. However, Patton's failure to observe the policy does not reasonably establish, standing alone, that he had a subjective intention to punish the plaintiffs or that he had knowledge that the plaintiffs would be exposed to a substantial risk of serious harm if they used the available supplies to clean up the blood in question. To be clear, the policy prohibiting inmates from handling blood *at all* is eminently reasonable and reflects the seriousness of the risk in question. But that does not mean that the circumstances underlying this case reflect an imposition of prison conditions "repugnant to the conscience of mankind" or that Officer Patton actually drew the inference that he was asking the plaintiffs to do something that subjected them to a substantial risk of serious harm and proceeded nonetheless.

c. *Qualified immunity*

The defendants also argue that Patton has immunity because he did not knowingly violate the Constitution. (Motion at 6-7.) The plaintiffs respond that Patton cannot benefit from qualified immunity because certain cases clearly establish that the Eighth Amendment is violated under the circumstances of this case. (Response at 11-12.)

Qualified immunity protects government actors "who could not reasonably have predicted that their actions would abridge the rights of others, even though, at the end of the day, those officials may have engaged in rights-violating conduct." Camilo-Robles v. Zapata, 175 F.3d 41, 43 (1st Cir. 1999). With respect to the extent of the protection conferred by the doctrine of qualified immunity, it has been said that "the doctrine of qualified immunity leaves 'ample

room for mistaken judgments' and protects 'all but the plainly incompetent or those who knowingly violate the law.'" Berthiaume v. Caron, 142 F.3d 12, 15 (1st Cir. 1998) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1st Cir. 1986)).

The qualified immunity inquiry has two parts. First, the court must decide whether the plaintiff has made out a violation of a constitutional right and, second, whether the right was clearly established at the time of the violation. Drumgold v. Callahan, 707 F.3d 28, 42 (1st Cir. 2013). The second part, the "clearly established" inquiry, "has two aspects." Id. One "focuses on the clarity of the law at the time of the violation" and the other "focuses more concretely on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiff's constitutional rights." Id. This ultimate inquiry is not a subjective inquiry but an objective inquiry into whether an officer performing a discretionary function, given all the facts in the record, would have believed that the conduct in question violated clearly established federal statutory or constitutional rights. Crawford-El v. Britton, 523 U.S. 574, 587-88 (1998); Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). To overcome this defense, it is not necessary for the plaintiffs to point to a plaintiff-favorable judicial decision on facts identical to their own. Instead, they must show that "the contours of the right [were] sufficiently clear." Rocket Learning, Inc. v. Rivera-Sanchez, 715 F.3d 1, 9 (1st Cir. 2013) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). Still, this is an inquiry that "must be undertaken in light of the specific context of the case, not as a broad general proposition." Id. (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)).

The particular circumstances of this case do not support an inferential finding that Officer Patton acted with deliberate indifference when he told the plaintiffs to clean up the spilled blood with the supplies on hand. However, should the Court hold a different view, the "clearly

established" inquiry will arise. On those questions—the clarity of federal law on the question at hand and what an objectively reasonable officer in the same situation would have believed—the plaintiffs have failed to identify clearly established federal law that prohibited Patton from acting as he did. What they have instead demonstrated is that state law or policy denies officers the discretion to proceed the way Patton proceeded.

Ordinarily, I would be loath to recommend that the Court apply qualified immunity in a case where it found trial-worthy evidence of deliberate indifference. The First Circuit has expressed its own puzzlement with this kind of scenario (qualified immunity in the face of an actionable claim of deliberate indifference), indicating that the Supreme Court might sometime have occasion, "when confronted with a claim of qualified immunity in a deliberate indifference case, [to] recognize the awkwardness of the fit and formulate a special set of rules to cover such situations." Camilo-Robles v. Hoyos, 151 F.3d 1, 15 (1st Cir. 1998). But "[u]ntil further guidance emerges," it holds that courts "have little choice but to apply the existing qualified immunity paradigm across the board." Id. See also Martinez-Velez v. Rey-Hernandez, 506 F.3d 32, 46 (1st Cir. 2007) (stating that in the context of a political discrimination case, "where wrongful motive is an element of the claim," assertions of objective reasonableness are "regularly rejected").

Despite the difficulty in reconciling these two standards, my view is that the current facts allow for differentiation based on the issue of whether federal precedents have "clearly established" that having a prisoner clean up some blood constitutes cruel and unusual punishment in the form of deliberate indifference to a substantial risk of serious harm. Although one might fairly infer that Patton violated a jail policy knowingly, or with constructive knowledge, it does not follow that a reasonable officer in his position would have believed,

under the same circumstances, that violation of the policy, which permits no inmate contact with blood whatsoever, would amount to a constitutional[4] deprivation.

The plaintiffs are correct that the Supreme Court has held that exposing inmates to unsanitary conditions can violate the Eighth Amendment. See Rhodes, 452 U.S. at 347-48 (reversing court of appeals and holding that double celling prisoners did not constitute cruel and unusual punishment where it "did not lead to deprivations of essential food, medical care, or sanitation [and] did [not] increase violence among inmates or create other conditions intolerable for prison confinement."); Hutto v. Finney, 437 U.S. 678, 682-83 & nn.3-6 (1978) (upholding trial court's imposition of remedial actions against the Arkansas penal system based on factual findings describing a catalog of abuses, including but not limited to a lack of sanitation in housing).[5] However, the general propositions announced in the Supreme Court's opinions do not clearly establish that one-time potential exposure to a bloodborne pathogen pursuant to an ill-considered assignment of clean-up duty constitutes deliberate indifference. In particular, in this case there is no evidence that the quantities of blood were substantial or that the plaintiffs were unable to avoid contact between the blood and their skin or other body tissue. Nor is there evidence suggesting that a reasonable officer might not have cleaned the blood up by recourse to

---

[4]     A constitutional standard is the only kind that the plaintiffs have asserted in relation to federal law.

[5]     In Hutto, the Court observed, in the context of unsanitary bunking practices that exposed inmates to hepatitis, that is was "plain . . . that the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards. A filthy, overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months." 437 U.S. at 686-87. It is also plain that conditions do not have to be as bleak as those described in Hutto to cross the cruel and unusual punishment threshold, but it cannot be ignored that the plaintiffs in this case suffered a solitary exposure to contagious blood and were not forced to—or left with no option but to—proceed in a manner that would require them to come into direct-skin contact with the blood hazard.

The duration, frequency, and intensity of exposure were also at work in the other Supreme Court opinion cited by the plaintiffs, Helling v. McKinney, 509 U.S. 25 (1993), where the Court affirmed a holding that a prisoner stated a constitutional claim based on prolonged exposure to high levels of second-hand smoke, without addressing a summary judgment record in relation to either the seriousness of the exposure or the presence of subjective deliberate indifference. Here, on a specific summary judgment record, it is possible to find a substantial risk of serious harm, but not the kind of subjective ill intention that amounts to deliberate indifference.

the same supplies used by the plaintiffs, even if such an approach would have been in violation of policy.

As for lower court consideration of when exposure to unsanitary conditions gives rise to a trial-worthy deliberate indifference claim, I have not identified a plaintiff-favorable ruling arising from a sufficiently similar summary judgment record, though there are cases denying dismissal at the pleading stage. Compare Watson v. Charles, No. 2:10-cv-321, 2011 U.S. Dist. Lexis 3692, at *8, 2011 WL 124649, at *3 (W.D. Mich. Jan. 14, 2011) (dismissing complaint where the plaintiff did "not allege that he was injured in any way or that he was directly exposed to pathogenic conditions" or "that he even touched . . . with unprotected skin" walls and floor allegedly having some "blood mixed with soap scum") with Randles v. Hester, No. 8:98-cv-01214-JDW, 2001 U.S. Dist. Lexis 21522, at *2-3, 2001 WL 1667821, at *1 (M.D. Fla. June 27, 2001) (denying motion to dismiss and finding that "Plaintiff's allegations that Defendant forced him, under the threat of discipline, to clean up massive blood spills without furnishing Plaintiff available protective clothing and equipment, demonstrate a deliberate indifference to a known, substantial risk of serious harm in violation of a clearly established Eighth Amendment right of which a reasonable person would have known, given the consensus of United States Supreme Court decisions proscribing the exposure of inmates to contagious or infectious diseases and other obviously dangerous conditions likely to produce future harm").[6]

The facts alleged in Randles are roughly similar too but have more troubling facts than the instant case. Like here, in Randles the jail policy clearly prohibited the cleanup duty imposed

---

[6] See also Clark v. Williams, 619 F. Supp. 2d 95, 105-107 (D. Del. 2009) (finding a trial-worthy issue where jail officials denied a different bunk assignment to plaintiff despite being informed that a cell mate had HIV and hepatitis B and suffered from bleeding sores); Binion v. Glover, No. 2:07-cv-13443-DML-MJH, 2008 U.S. Dist. Lexis 70032, 2008 WL 4155355 (E.D. Mich. July 28, 2008), report and recommendation adopted, 2008 U.S. Dist. Lexis 66896, 2008 WL 4097407 (Aug. 29, 2008) (denying qualified immunity where "plaintiff presented evidence that the failure to follow the exposure control policy and universal precautions were widespread, obvious to anyone observing the treatment in the facility, and regularly practiced by defendant Glover").

by the defendant. 2001 WL 1667821, at *6-7. The <u>Randles</u> court pointed to the policy and to the fact the plaintiff was expected to use only a pair of plastic or latex gloves and a mop as sufficient to allege an objectively serious risk, which is consistent with my recommendation herein. <u>Id.</u> at *7-8. Unlike my recommendation, the <u>Randles</u> court found the allegations were sufficient to suggest a deliberately indifferent subjective mindset based in part on the existence of the policy, but also based on the defendant's deposition testimony that he would not have cleaned up the spills in question (described as "large" or "massive" spills in the court's decision) without the benefit of a protective blood-spill suit.[7] <u>Id.</u> at *8. The allegations also indicated that the defendant imposed such cleanup duties on the plaintiff three times and that each time the plaintiff asked for protective clothing and was denied. <u>Id.</u> at *2. These differences—the volume of blood, the repeated imposition of cleanup duty, the repeated denial of a request for protective equipment known by the defendant to be available, and the defendant's testimony that he would not have performed the cleanup with the limited equipment he allowed the plaintiff—are material differences as far as the defendant's subjective mindset is concerned. This case does not involve large quantities of blood, or any testimony by the defendant officer, or repeated impositions, or any denial of a reasonable request to access additional protective gear. To be sure, Patton's actions were unwise and against sound policy and caused the plaintiffs to run an unreasonable risk, but the circumstances do not suggest the sort of extreme hazard or culpable state of mind that would warrant a finding of a violation of clearly established constitutional law.

This summary judgment recommendation is supported by at least one circuit court opinion. In <u>Rish v. Johnson</u>, 131 F.3d 1092 (4th Cir. 1997), a panel of the Fourth Circuit Court

---

[7]        The evidence concerning the defendant's subjective mindset must have been significant. The <u>Randles</u> court noted that in a parallel action by the plaintiff in a state court, the state attorney general argued, successfully, that the state department of corrections should have immunity because the federal court defendant's conduct was "criminal." 2001 WL 1667821, at *7 n.2.

of Appeals reviewed a district court decision denying qualified immunity where inmates alleged that their constitutional rights were violated "by failing to provide appropriate protective equipment and clothing to safeguard them from the risk of contracting infectious diseases during the performance of their duties as orderlies responsible for cleaning blood and other body fluids from environmental surfaces." Id. at 1094. The district court found "that a reasonable person, especially a federal officer trained in the prevention of infection or charged with ensuring that inmates take the required precautions, would know that they were violating [the] inmates' constitutional rights if they refused to provide the required equipment or training." Id. at 1095. In support of their claim, the plaintiffs presented evidence of a universal precautions policy and expert testimony concerning the risk of infection from blood exposure. Id. at 1099. However, the court of appeals held that the evidence was not sufficient to demonstrate that the officials possessed actual knowledge of a substantial risk of harm. Id. In particular, the court noted that the plaintiffs had failed to present any "deposition testimony or affidavit indicating that the prison officials actually knew of a risk of harm," and reasoned that, in the absence of such evidence, the plaintiffs relied entirely on an assertion "essentially that the risk is so obvious that it may be inferred that the prison officials possessed actual knowledge of the risk." Id. Turning to that question, the court of appeals reviewed expert evidence, federal bureau of prisons policy, and OSHA regulations concerning the hazards of handling blood and other bodily fluids without adequate protection. Id. at 1099-1100. The court found such evidence was inadequate to establish deliberate indifference, holding that it was not "adequate to demonstrate that the failure to follow universal precautions created such an obvious and substantial risk that the prison officials must have been aware of it." Id. at 1100 (2-1).[8]

---

[8]     See also, cf., Loper v. Unidentified, 95 F.3d 1147 (5th Cir. 1996) (table) (per curiam) (affirming dismissal

Qualified immunity, and by extension summary judgment, should be granted to Patton under the circumstances of this case.

### d. Emotional injury

Concerning Plaintiff Sans alone, the defendants assert that there can be no claim for compensatory emotional damages because he did not suffer a physical injury.  (Motion at 5-6.) This argument turns on the fact that Sans already had hepatitis C and has conceded that he did not suffer any physical injury.  (Statement ¶¶ 44-45.)

The Prison Litigation Reform Act provides:  "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act."  42 U.S.C. § 1997e(e).  The issue is whether the statute bars compensatory damages for mental or emotional injury in cases in which a prisoner's constitutional rights have been violated but he or she has not been physically injured.  The First Circuit recently noted that "[s]ome courts have interpreted section 1997e(e)'s limitation not to apply to constitutional claims."  <u>Kuperman v. Wrenn</u>, 645 F.3d 69, 73 n.5 (1st Cir. 2011) (citing <u>Thompson v. Carter</u>,

---

of prisoner's claim as "frivolous").  The circumstances were found to be as follows:

> Loper complains that prison officials forced him to clean massive amounts of blood from two cells in which prisoners had attempted or committed suicide.  The appellant's testimony at the Spears hearing, however, demonstrates that officials were not deliberately indifferent to the possibility that he might contract HIV.  The first time officials assigned Loper this task a prison nurse supervised him.  She provided him with latex gloves and a medical apron and advised him to treat all blood as contaminated.  The nurse also instructed Loper to change his gloves immediately if they broke and to avoid getting blood in his eyes and mouth.  On the second occasion, officials gave Loper two kits which included spill clean-up instructions, latex gloves, goggles, and a face mask.  Prison officials, therefore, recognized that the blood might pose a danger and took significant steps to avoid any risk of infection.  The magistrate judge did not abuse her discretion in dismissing Loper's claim.

1996 WL 481335, at *1.

284 F.3d 411, 416-17 (2d Cir. 2002) (collecting cases)[9]). The Court held that it need not decide the issue because the plaintiff also had requested nominal and punitive damages, which the Court held were sufficient to "keep his claims alive" beyond the summary judgment stage. Id. Based on Kuperman, the defendants' argument is not sufficient to remove Sans as a plaintiff. Among other forms of relief, Sans requests punitive damages. There is also some question whether a physical injury requirement would apply to the constitutional claim in this case. Proof of a physical injury is not a uniform element of a deliberate indifference claim and courts have reasoned that section 1997e(e) is not meant to bar claims "where the harm that is constitutionally actionable is the violation of intangible rights-regardless of actual physical or emotional injury." Shaheed–Muhammad v. Dipaolo, 138 F. Supp. 2d 99, 107 (D. Mass.2001) (citing Rowe v. Shake, 196 F.3d 778, 781 (7th Cir.1999) ("[Section] 1997e(e) applies only to claims for mental or emotional injury. Claims for other types of injury do not implicate the statute.") (citations omitted); Canell v. Lightner, 143 F.3d 1210, 1213 (9th Cir.1998) ("[T]he deprivation of First Amendment rights entitles a plaintiff to judicial relief wholly aside from any physical injury he can show, or any mental or emotional injury he may have incurred. Therefore, § 1997e(e) does not apply . . .")). At most, section 1997e(e) would preclude0 Sans (and possibly Thurston) from any recovery of emotional distress damages. As recently noted by Judge Saris, the First Circuit may soon address this issue in a case that was argued in May of this year. See Cryer v. Spencer, 934 F. Supp. 2d 323, 338 (D. Mass. 2013) (reserving the issue in an order on motion to dismiss and noting that an answer may be forthcoming in Ford v. Bender, No. 12-1622 (1st Cir.)).

---

[9]    Among other things, the Second Circuit noted that the title of section 1997e(e) speaks of "Limitation on recovery," not preclusion of suit. Thompson, 284 F.3d at 418.

e. *Failure to exhaust*

The defendants argue that Sans's constitutional claim cannot go forward in any event because he failed to exhaust administrative remedies. (Motion at 4-5.) Sans's effort to deflect this argument is based on an evidentiary objection alluded to in the preceding factual recitation. Sans argues that the defendants have failed to establish the factual basis for this affirmative defense because they did not produce their grievance policy in discovery.

The PLRA provides: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This provision provides the defendants with an affirmative defense. Jones v. Bock, 549 U.S. 199, 212 (2007).

The defendants have asserted the issue of non-exhaustion by means of the affidavit of the Jail's Captain of Operations and Security. He attests that matters such as the August 8, 2011, incident are subject to the grievance procedure and that Sans (unlike Thurston) never filed a grievance concerning the incident. Sans has not offered anything of evidentiary value to support a contrary finding.

I withhold a recommendation on this particular contest over the adequacy of the defendants' showing that Sans failed to exhaust his section 1983 claim. There is an unbriefed issue here concerning the defendants' compliance with Rule 26(a)(1)(A)(ii) and the consequence under Rule 37(c)(1) of their potential failure to initially disclose the existence of the grievance policy that underlies their assertion of an affirmative defense. In the context of a ruling that the plaintiffs have failed to raise a genuine issue of material fact and that summary judgment should

enter for the defendants on the merits of the section 1983 claim there would be no need for the court to wade into this issue, which seems advisable in the absence of any briefing by counsel.

**B.      The State Law Tort Claim**

In his second count, Plaintiff Thurston advances a state law claim of negligence against all of the defendants.  Plaintiff Sans does not advance this claim.  The defendants assert immunity defenses under the Maine Tort Claims Act.  (Motion at 14-19.)  Thurston responds that the MTCA's exception to immunity for "operation and maintenance" of a public building applies here and that discretionary function immunity cannot shield the defendants because decisions about cleaning up blood are in the nature of ministerial acts.  (Response at 13-14, citing 14 M.R.S. §§ 8104-A(2) & 8104-B(3).)

I recommend that the Court not reach these state law questions.  "As a general principle, the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit, well before the commencement of trial, will trigger the dismissal without prejudice of any supplemental state-law claims."  Rodriguez v. Doral Mortg. Corp., 57 F.3d 1168, 1177 (1st Cir. 1995).  I do not see special circumstances here that would warrant removing this case from the general rule. I recognize that the running of the two-year statute of limitation found in 14 M.R.S. § 8110 is an important consideration here.  However, the Maine Revised Statutes chapter governing the limitation of actions includes a provision permitting the "commencement of [a] new action after failure."  14 M.R.S. § 855.  According to this statute, when an action is "defeated for any matter of form . . . the plaintiff may commence a new action on the same demand within 6 months after determination of the original action."  Id.  Although the application of this statute following a federal dismissal of pendent state law claims has not been discussed in any prior decision of this court, the Maine Superior Court, or in an opinion of the Maine Supreme Judicial Court, the

District of Massachusetts applies a similar Massachusetts statute in this manner.  See Duca v. Martins, 941 F. Supp. 1281, 1295 n.14 (D. Mass. 1996) (applying Mass. Gen. Laws ch. 260 § 32 and citing Liberace v. Conway, 574 N.E.2d 1010, 1012-13 (Mass. App. Ct. 1991), review denied, 579 N.E.2d 1361 (1991) (holding that M.G.L. ch. 260 § 32 applies to state law claims dismissed by federal court which had declined to exercise pendent jurisdiction and describing dismissal without prejudice as "an essentially technical disposition" that should be likened to a dismissal based on "form")).

Because Plaintiff Thurston's state law claim has been "defeated" in this Court based not on the substance of the claim, but rather based on the "form" of his plea for an exercise of supplemental jurisdiction, state law affords him an opportunity to pursue his claim in state court so long as he does so within six months of the final determination of his federal claim.   I therefore recommend that the Court dismiss the pendent state law claim without prejudice.

## CONCLUSION

For reasons set forth above, I recommend that the Court grant, in part, the Defendants' Motion for Summary Judgment (ECF No. 32) and dismiss count I, the sole federal claim, with prejudice.  I further recommend that the Court not grant summary judgment against count II, the state law claim, but rather dismiss it without prejudice.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

December 17, 2013